UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ST. BERNARD PORT, HARBOR      CIVIL ACTION
TERMINAL DISTRICT

VERSUS             NO: 11-8

VIOLET DOCK PORT, INC., LLC      SECTION: R(3)

## ORDER AND REASONS

Before the Court is St. Bernard Port, Harbor & Terminal District's motion to remand.[1]  Because Violet Dock Port has not asserted a valid basis for this Court's jurisdiction, St. Bernard Port's motion is GRANTED.

## I.   BACKGROUND

This case involves the expropriation by St. Bernard Port of about 70 acres of riverfront property in St. Barnard Parish.  The property is located six miles from St. Bernard Port's existing facility, and it is owned by Violet.  St. Bernard Port is a public corporation and a political subdivision created by the State of Louisiana to regulate all domestic, coastwise, and intercoastal commerce and traffic in St. Bernard Parish.[2]  La.

---

[1]  (R. Doc. 13.)

[2]  (R. Doc. 1-1 at 1.)

Rev. Stat. §§ 34:1701; 34:1703(A).  Violet is a Louisiana limited liability company.[3]

Since 1984, Violet has used a portion of the property at issue to provide layberths to United States military vessels under contracts between Violet and the United States Navy, Military Sealift Command (MSC).  According to Donald Dieudonne, Violet's General Manager for Operations, those contracts have "explicit wharf construction specifications, mooring specifications, pier specifications, other security and service requirements, all of which are strictly enforced by the United States."[4]  Under the current contract, executed on March 20, 2009, Violet agreed to provide layberthing services to MSC for two U.S. Navy Large, Medium-Speed, Roll-On/Off (LMSR) ships.  The primary mission of the ships is "to provide lift capacity for unit equipment (vehicles and rotary wing aircraft) to support Army divisions or other units."[5]  The contract provides for an initial fixed period of performance until September 30, 2009, and then nine one-year periods in which MSC has the option to extend

---

[3]     (*Id.*)

[4]     (R. Doc. 31-4.)

[5]     (R. Doc. 2-2 at 14; R. Doc. 33-1 at 2.)

the contract.[6]  On January 12, 2011, MSC issued a Modification to the contract, which included, *inter alia*, a replacement of FAR 52.211-15 (Sep. 1990) with FAR 52.211-15 (Apr. 2008).  FAR 52.211-15 (Apr. 2008) provides:  "This is a rated order certified for national defense, emergency preparedness, and energy program use, and the Contractor shall follow all the requirements of the Defense Priorities and Allocation System regulation (15 CFR 700)."[7]  The contract also incorporates by reference clauses from the Code of Federal Regulations that permit MSC to terminate either for convenience[8] or in the event that Violet fails to perform.[9]

Before expropriating the property, St. Bernard Port attempted to obtain it through a consensual purchase, as required by Louisiana law.  *See* La. Rev. Stat. § 19:2.2 ("Before exercising the rights of expropriation provided for in R.S. 19:2, the state or its political corporations or subdivisions shall . . . (2) Offer to compensate the owner an amount equal to at least the lowest appraisal or evaluation.").  On January 10,

---

[6]   (R. Doc. 2-2 at 2.)

[7]   (*Id.* at 32.)

[8]   (R. Doc. 33-5 at 3; 48 C.F.R. § 52.249-2.)

[9]   (R. Doc. 2-2 at 37; 48 C.F.R. § 42.249-8.)

2007, St. Bernard Port offered $10 million, the amount at which the property was initially appraised.[10]  Violet informed St. Bernard Port on April 17, 2007 that its stockholders had rejected that offer.[11]  After more negotiations and a second appraisal, St. Bernard Port offered to purchase the property for $16 million on September 7, 2010.  Violet rejected that offer as well.

On September 30, 2010, the Board of Commissioners of St. Bernard Port passed a resolution to expropriate Violet's property under La. Rev. Stat 19:2.1 and 19:12.[12]  In that resolution, the Board provided the following statement of purpose:

> St. Bernard Parish continues to recover from the devastating hurricanes that have struck our coast since 2005, one area of the economy that has been in the forefront of economic growth and development is the port industry.  In the St. Bernard Parish Economic Recovery Model, the Port is one of the basic industries of the Parish.  Basic industries are the foundation of a region's economy because their goods and services are exported (i.e., sold to people outside of the region) and, therefore, bring revenues into the community. Commerce through the Port of St. Bernard represented 24% of the Interim Recovery Plan, the citizens of St. Bernard Parish identified the development of the Violet Site as one of their highest economic development priorities:  The acquisition and development of the Violet Terminal would be the logical downriver extension of port services in St. Bernard Parish.  The Citizen's Recovery Committee recommended that Parish and/or State roads be extended to directly access the Violet Site, recognizing the need for

---

[10]     (R. Doc. 13-4.)

[11]     (R. Doc. 13-5.)

[12]     (R. Doc. 2-9 at 9-15.)

4

> projects to energize the Parish's recovery.  The project is
> basically a port expansion project accomplished by acquiring
> property and assets on the Mississippi River.  The Port
> would acquire three heavy duty docks and over 4,200 linear
> feet of river frontage that would be available for immediate
> use.  The 38 acres of uplands are largely undeveloped for
> cargo storage, but with a minimal investment could be
> prepared as valuable lay-down area for commodities and
> project cargoes[.][13]

The Board further resolved that the property would be for

"predominate use by the public and shall not be for predominant

use by, or for transfer of ownership to, any private person or

entity."[14]

In a letter dated November 2, 2010, MSC wrote to Violet,

stating that "[i]t has come to the Government's attention that

there may be an issue with Violet's ability to continue to

provide layberth services under the subject contract."[15]  The

letter further stated that, under Section H-10, "this is a

performance based contract," and "[t]he Contractor is required to

provide, operate, and maintain a safe berth for the firm and all

options periods (if exercised)."[16]  MSC requested that Violet

respond in writing if Violet would be unable to perform under the

---

[13]    (*Id.* at 11.)

[14]    (*Id.*)

[15]    (R. Doc. 2-14.)

[16]    (*Id.*)

contract, including "facts of the situation, potential impact to the subject contract, and a timeline of events."[17]

St. Bernard Port filed a petition for expropriation in the 34th Judicial District Court for St. Bernard Parish on December 22, 2010[18] and deposited $16 million in that court's registry as estimated just compensation for the expropriation.[19] According to the petition and the affidavit of Robert Schafidel, St. Bernard Port's executive director, the purpose of the expropriation is for the construction of a bulk terminal facility capable of accommodating both liquid-bulk and dry-bulk commodities.[20] Schafidel states that the construction of the bulk terminal is planned to occur in three phases and will take about eight to ten years to complete: "Phase I will include the acquisition of the Violet Dock Port site and the completion of certain short-term improvements on the site to make the existing facilities useful for stevedoring activities."[21] "Phase II consists of constructing a dry bulk storage facility, rail

---

[17]   (*Id.*)

[18]   (R. Doc. 1-1.)

[19]   (R. Doc. 1-1 at 21-23.)

[20]   (R. Doc. 2-9 at 18; R. Doc. 15-1 at 2.)

[21]   (R. Doc. 15-1 at 2.)

access, truck access, queuing and weighing facility, conveyor
systems, and other dock improvements."[22]  And "Phase III consists
of the development of a liquid bulk tank farm, rail access and
storage facilities, a pipe network, and other dock
improvements."[23]  The petition also states that the expropriation
is intended "to create jobs and benefits to the citizens of St.
Bernard Parish" and that St. Bernard Port intends to "enter into
a new contract with Military Sealift Command for its continued
use of the Violet Port during Phase I of the acquisition and
development of the Violet Dock Port."[24]

     On December 29, 2010, MSC sent a letter to St. Bernard Port
explaining that it had received notice that the subject property
had been expropriated and that St. Bernard Port intended "to take
over the subject contract."[25]  In light of the expropriation, MSC
requested (1) a point of contact at St. Bernard Port, (2) a
proposed timeline for transferring the subject contract "should
this contract be novated," and (3) "confirmation that the Port
intends to accept the same terms and conditions of the subject

---

[22]    (*Id.*)

[23]    (*Id.*)

[24]    (R. Doc. 2-9 at 22.)

[25]    (R. Doc. 15-8.)

contract," "should this contract be novated."[26]  St. Bernard Port
responded on January 5, 2011, providing a point of contact,
stating that "St. Bernard Port stands ready to immediately assume
the referenced contract, subject to the current court proceedings
concerning the expropriation," and confirming that it intends to
accept the terms and conditions of Violet's contract with the
MSC.[27]

   Violet removed the matter to this Court on January 3, 2011[28]
and moved to dismiss St. Bernard Port's expropriation.[29]  St.
Bernard Port then filed the instant motion to remand on January
11, 2011.[30]  The Court heard oral argument on the remand motion
and determined that it would be informative to have MSC take a
position on whether the expropriation would interrupt or
otherwise adversely affect the services for which it has
contracted.  On the Court's order,[31] MSC submitted a letter on
March 17, 2011.[32]  MSC stated: "While the expropriation of

---

[26]    (R. Doc. 15-8.)

[27]    (R. Doc. 15-9.)

[28]    (R. Doc. 1.)

[29]    (R. Doc. 2.)

[30]    (R. Doc. 13.)

[31]    (R. Doc. 38.)

[32]    (R. Doc. 44.)

Violet's property has the potential to affect its ability to perform under the terms of the contract, since the Navy has no real property interest affected by the District's expropriation, it currently believes that the expropriation does not affect the Government's contractual rights and remedies."[33]  MSC also stated that "[t]he proposed expropriation could adversely affect the services provided the Navy under the subject contract in the future. . . ."[34]  It explained that, because Violet maintains that it will not seek to novate the contract, "there is some uncertainty regarding future contract performance."[35]  On July 27, 2011, MSC sent an additional letter to Violet, giving it preliminary notice that it intends to exercise its third option on the contract, extending performance until September 30, 2012.[36]

## II.  DISCUSSION

Violet raises three independent bases for federal jurisdiction: 28 U.S.C. § 1442(a)(1); 28 U.S.C. § 1442(a)(2); and

---

[33]   (R. Doc. 44-1 at 1.)

[34]   (*Id.*)

[35]   (*Id.* at 2.)

[36]   (R. Doc. 65-4.)

28 U.S.C. § 1441(b).  The Court addresses each of these jurisdictional statutes in turn.

## A.    28 U.S.C. § 1442(a)(1)

Violet first argues that jurisdiction in this case is properly founded upon the federal officer removal statute, 28 U.S.C. § 1442(a)(1).[37]  The federal officer removal statute provides, in relevant part:

> A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
>> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

28 U.S.C. § 1442(a)(1).  The Supreme Court has explained that the purpose of this provision is to protect the lawful activities of the federal government from undue state interference.  *See Willingham v. Morgan*, 395 U.S. 402, 406 (1969).  Because the federal government "can act only through its officers and agents," it has a strong interest in ensuring that the states do not hinder those officers in the execution of their duties.  *Id.* (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)).  If

---

[37]    (R. Doc. 1 at 2-6; R. Doc. 31-3 at 10-32.)

federal officers acting within the scope of their authority "can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection . . . the operations of the general government may at any time be arrested at the will of one of its members." *Id.* (quoting *Davis*, 100 U.S. at 263); *see also Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142 (2007) ("As Senator Daniel Webster explained [in 1833], where state courts might prove hostile to federal law, and hence to those who enforced that law, the removal statute would 'give a chance to the [federal] officer to defend himself where the authority of the law was recognized.'") (quoting 9 Cong. Deb. 461 (1833)).

Because of its broad language and unique purpose, the federal officer removal statute has been interpreted to operate somewhat differently than the general removal provision. Unlike the general removal statute, which must be "strictly construed in favor of remand," *Manguno v. Prudential Property & Casualty Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002), the federal officer removal provision's broad language must be liberally interpreted. *Watson*, 551 U.S. at 147. Also unlike the general removal provision, there is no requirement in the federal officer removal

provision that the district court have original jurisdiction over the plaintiff's claim.  A case against a federal officer may be removed even if a federal question arises as a defense rather than as a claim apparent from the face of the plaintiff's well-pleaded complaint.  *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 430-31 (1999).

As in all cases, the party asserting federal jurisdiction in a case removed under section 1442 bears the burden of establishing that jurisdiction exists.  *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998).  The Fifth Circuit has adopted a three-part test to determine whether a government contractor qualifies as a "person acting under [a federal] officer" who is "sued in an official or individual capacity for any act under color of such office."  28 U.S.C. § 1442(a).  The contractor must prove that: (1) he is a "person" within the meaning of the statute; (2) he acted pursuant to a federal officer's directions, and a causal nexus exists between his actions under color of federal office and the plaintiff's claims; and (3) he has a colorable federal defense to the plaintiff's claims.  *Winters*, 149 F.3d at 398, 400.

With regard to whether the instant expropriation petition, St. Bernard Port does not dispute that Violet is subject to the directions of a federal officer, here MSC.  The disputed issues

12

are: (1) whether Violet is a "person" within the meaning of section 1442(a)(1); (2) whether a causal nexus exists between Violet's actions under color of federal office and St. Bernard Port's claim; and (3) whether Violet is able to assert a colorable federal defense.  As explained below, the Court finds that Violet has not met its burden of establishing federal officer removal jurisdiction.

    1.   <u>"Person" Requirement</u>

Although St. Bernard Port does not explicitly challenge Violet's status as a "person" under section 1442(a)(1), it states, in a footnote, that Violet is "a limited liability company, not a corporation," and notes that Violet did not cite any case in its motion to remand in which "a limited liability company has been deemed to meet the 'person' requirement of § 1442(a)(1)."[38]  Although the Fifth Circuit has not specifically addressed whether an LLC is a "person" for the purposes of the federal officer removal statute, numerous courts have permitted LLCs to remove on that basis.  *See, e.g.*, *Takacs v. American Eurocopter, LLC*, 656 F. Supp. 2d 640, 645 (W.D. Tex. 2009) (finding that an LLC was a person under section 1442(a)(1));

---

[38]    (R. Doc. 13-1 at 7 & n.23.)

*McGillick v. World Trade Center Properties, LLC*, 2004 WL 2049260,
*2 (S.D.N.Y. 2004) (same) (citing *Winters*, 149 F.3d at 398); *see
also Dennis v. Allis-Chalmers Corp. Product Liability Trust*, 2009
WL 1874017, *1 (N.D. Cal. 2009) (granting plaintiffs' motion to
remand *after* the party asserting federal officer removal, an LLC,
was dismissed from the suit).  As St. Bernard Port has not cited
any authority to the contrary, and the Court is aware of none,
the Court finds that Violet is a "person" within the meaning of
the statute.

    2.   <u>Causal Nexus between Violet's "Actions" and St. Bernard
        Port's Claim</u>

    The plain language of section 1442(a)(1) permits removal
only when "[t]he United States or any agency thereof or any
officer (or any person acting under that officer) of the United
States or of any agency thereof" is "sued in an official or
individual capacity for any act under color of such office."  28
U.S.C. § 1442(a)(1).  The main thrust of St. Bernard Port's
argument is that Violet has failed to show that the expropriation
suit is "for" an "act" under color of federal law.  Put
differently, St. Bernard Port contends that it is not Violet's
performance of the MSC contract that forms the basis of its
expropriation suit.  Rather, it is the expansion of its port

services and the construction of a bulk cargo storage facility on the property.  Therefore, it argues, there is no causal connection between the expropriation and Violet's federal activity.  For its part, Violet argues that the causal nexus is satisfied because St. Bernard Port is primarily expropriating the property to take over its contract with MSC.  Violet contends that "it was the millions of dollars poured into the property . . . the years of work undertaken by it to comply with the MSC Contract specifications, and the improvements, permits and other acquisitions . . . that made this property desirable to" St. Bernard Port.[39]

The Court finds that Violet has failed to establish a causal nexus between the expropriation and any act under color of federal office.  St. Bernard Port's statement of purpose in the resolution authorizing expropriation provides that the property was expropriated in order to promote economic development through expansion of its port services and construction of a cargo storage facility.[40]  St. Bernard Port also submits the affidavit of Robert Schafidel, who attests that the purpose of the expropriation is for the construction of a bulk terminal

---

[39]   (R. Doc. 31-3 at 18-19.)

[40]   (R. Doc. 2-9 at 11.)

15

facility, which will proceed in stages over the next eight to ten years.[41]  Although Violet asserts that St. Bernard Port is, in fact, expropriating the property primarily to take over performance of its contract with the MSC, that argument does not explain St. Bernard Port's expropriation of the entirety of Violet's property, as Violet's contract with MSC implicates only one of Violet's five berths and only a fraction of the 70 acres St. Bernard Port seeks to expropriate.[42]  Nor has Violet submitted anything, other than its own characterization, to suggest that acquisition of the MSC property was the primary motivating cause of this 70 acre expropriation.  The Supreme Court's dicta in *Jefferson County, Alabama v. Acker*, 527 U.S. 423 (1999), in which the Court credited the defendant's theory of case for the purposes of the jurisdictional inquiry, does not compel a different result.  Contrary to Violet's suggestion, *Acker* did not set out a categorical rule that courts may not look to the reality of the transaction underlying the alleged basis for removal.

A review of the relevant case law reveals that the federal officer removal statute cannot serve as the basis for

---

[41]    (R. Doc. 15-1 at 2.)

[42]    (Transcript of Oral Argument on St. Bernard Port's Motion to Dismiss at 13.)

16

jurisdiction in an expropriation action such as this one.   In

*Murray v. Murray*, 621 F.2d 103 (5th Cir. 1980), the Fifth Circuit

distilled the situations in which federal officer removal

jurisdiction applies.   The court explained that section

1442(a)(1) permits removal of those actions in state court "that

expose a federal [officer] to potential civil liability or

criminal penalty for an act performed in the past under color of

office" or "civil actions that seek to enjoin a federal officer

from performing such acts in the future." *Id.* at 107.   A number

of other cases illustrate the scope of federal officer removal

jurisdiction as set forth in *Murray*.   For instance, in *State of

Florida v. Cohen*, 887 F.2d 1451 (11th Cir. 1989), the Eleventh

Circuit found removal proper in a case involving a contempt

proceeding against federal agents.   *Id.* at 1454.   In doing so,

the court explained that section 1442(a)(1) permits removal of

actions commenced in state court that either (1) potentially

expose a federal official to civil liability or criminal penalty

for an act performed in the past under color of office, or (2)

seek to either prohibit or require certain actions by a federal

official in the future.   *Id.* at 1453-54; *see also Sheda v. U.S.

Dept. of the Treasury*, 196 F. Supp. 2d 743, 746 (N.D. Ill. 2002)

(finding that, because "[t]here is no allegation of wrongdoing,"

the action could not be classified as an action "for any act

17

under color of such office" and that removal was thus improper); *Brand v. Robins Federal Credit Union*, 969 F. Supp. 779, 780 (M.D. Ga. 1997) ("[T]he removal of a case to federal court must presuppose the availability of an underlying right of action for the wrongs sought to be redressed, for without such right of action there is no federal interest in the matter as it concerns federal courts."); *Fountain Park Cooperative, Inc. v. Bank of America National* Trust, 289 F. Supp. 150, 154 (C.D. Cal. 1968) ("[Section 1442(a)(1)'s] purpose is to permit the removal of cases where federal officers are threatened with personal civil or criminal liability because of actions taken in pursuance of their federal duties."); *State of New Jersey v. Moriarity*, 268 F. Supp. 546, 555-56 (D.N.J. 1967) (explaining that section 1442(a)'s "traditional emphasis has been on cases where a Federal officer was threatened with monetary judgment or criminal prosecution" but that the statute has been "successfully invoked in a few instances where the only relief sought was an injunction against proposed actions").

The Court also finds telling the Sixth Circuit's discussion of section 1442(a)(1) in *City of Cookeville, TN v. Upper Cumberland Electric Membership Corporation*, 484 F.3d 380 (6th Cir. 2007). In that case, the city brought a state court condemnation action against a number of defendants, including the

18

Rural Utilities Service (RUS), a federal agency.  RUS removed the action under section 1442(a)(1), and the district court denied the city's motion to remand.  On appeal, the Sixth Circuit upheld the district court's finding of jurisdiction, explaining that jurisdiction was proper "because a federal agency was a party." *Id.* at 384.  Based on a textual interpretation of the removal statute, the court indicated that, even though federal officers must establish that the suit is "'for' an act under color of office" in order to remove, that requirement does not apply when a federal agency is a party to the litigation.  *See id.* at 389-90.  The clear implication of the court's reasoning is that, if RUS had not been a party, removal under section 1442(a)(1) would have been inappropriate.

Violet's reliance on *Acker* to suggest that removal under section 1442(a)(1) is appropriate in a broader range of situations is misplaced.[43]  There, the county attempted to impose civil liability on a group of federal judges for the act of engaging in their occupation.  *Acker*, 527 U.S. at 424.  *Acker* therefore fits squarely within the universe of cases identified in *Murray.*  The Court has found no authority – and Violet provides none – suggesting that the holder of a government

---

[43]    (R. Doc. 31-3 at 10 n.3.)

contract may remove an expropriation action pursuant to section 1442(a)(1) when it is not exposed to liability.  When government contractors have successfully invoked federal officer removal jurisdiction, it has been in circumstances where they were exposed to liability in tort or contract for acts done in the performance of their government contracts.  *See, e.g.*, *Winters*, 149 F.3d at 399-400 (affirming the district court's finding that Agent Orange manufacturer could remove state-filed tort action under section 1442(a)(1)); *C.R. Pittman Constr. Co., Inc. v. Parson and Sanderson, Inc.*, 2010 WL 3418240, at *2 (E.D. La. 2010) (finding removal proper under section 1442(a)(1) in a breach of contract action against a defense contractor); *Regional Medical Transport, Inc. v. Highmark, Inc.*, 541 F. Supp. 2d 718, 724 (E.D. Pa. 2008) (finding removal appropriate given plaintiffs' claims of tortious interference with contractual relations, misfeasance, and negligent supervision against a Medicare contractor).

In this case, as in *Murray*, the plaintiff has not exposed a federal officer or a person acting under that officer to liability for performing acts under color of office or sought to enjoin such acts in the future.  Violet is being sued in its capacity as a landowner, not for any sort of wrongdoing.  In expropriations, the state is required to compensate landowners

20

such as Violet to the full extent of their losses.  *See* La. Rev. Stat. § 19:9; *State, Dept. of Transp. & Dev. v. Pipes*, 489 So.2d 293, 294-95 (La. Ct. App. 1986) (affirming jury award for loss of contractual profits resulting from expropriation).  And although the practical effect of the expropriation may be that Violet could no longer perform its contract with MSC because it would no longer have access to the property, that result is not an "injunction" as that term is properly understood.  *See Black's Law Dictionary* 855 (9th ed. 2009) (defining "injunction" as "[a] *court order* commanding or preventing an action") (emphasis added); *Merriam-Webster's Collegiate Dictionary* 644 (11th ed. 2009) (defining "injunction" as "a writ granted by a court of equity whereby one is required to do or to refrain from doing a specified act)*.*  St. Bernard Port has maintained throughout the pendency of this litigation that it stands ready to provide layberthing services to MSC and does not intend to interfere with its operations.  The effect of the expropriation would not therefore be to prevent governmental activity, only to prevent Violet, as opposed to St. Bernard Port from carrying it out.

Further, MSC appears indifferent as to whether it is St. Bernard Port or Violet that performs the contract.  The facilities necessary for performance are already in place, and, according to Violet's counsel, Violet maintains only a small

staff of fewer than ten employees.[44]  Unlike, for example, a
contract to build ships or submarines, or to maintain a nuclear
facility, fulfillment of Violet's contract with MSC does not
require special skills.  In terms of service requirements,
performance of the contract requires mundane tasks such as
providing shore power, sewage, and garbage collection,[45] all of
which could be performed by St. Bernard Port.  Indeed, when MSC
learned of the pending expropriation, MSC made no effort to
dissuade St. Bernard Port from proceeding.  Instead, MSC wrote to
Robert Schafidel, St. Bernard Port's executive director, seeking
confirmation that it would accept the same terms as set forth in
Violet's contract.[46]  Then, in order to determine the effect of
the expropriation on military preparedness, the Court ordered MSC
to communicate its position regarding the expropriation and
whether the expropriation would interrupt or otherwise adversely
affect the services for which it has contracted.  In response,
MSC acknowledged that "there is some uncertainty regarding future
contract performance," but stated that, "since the Navy has no
real property interest affected by the [ ] expropriation, it

---

[44]    (Transcript of Oral Argument on St. Bernard Port's
Motion to Dismiss at 9.)

[45]    (R. Doc. 2-2 at 19-21.)

[46]    (R. Doc. 15-8.)

22

currently believes that the expropriation does not affect the Government's contractual rights and remedies."[47]  Notably, MSC did not suggest that the expropriation would adversely affect the Navy, given the availability of contractual remedies, which include termination of Violet's contract for convenience, or that it would in any way interfere with national security.  If MSC were, in fact, concerned that this expropriation would have a detrimental affect on national security, it could have easily raised those issues when invited to do so or at any point afterward.  Or, MSC could have intervened as a party, thereby making the case removable under the reasoning in *City of Cookeville*.  *See* 484 F.3d at 389-90.  That it did neither suggests indifference on the part of the Navy as to who actually provides the layberthing services.  Further, the Court does not find significant MSC's recent indication that it intends to exercise the third option period of the contract.  If anything, that MSC has expressed an intention to continue berthing its vessels at one of Violet's berths, despite the ongoing litigation, suggests a lack of concern about the effects of expropriation.  Clearly, MSC does not perceive the expropriation as an effort to enjoin its operations.

---

[47]    (R. Doc. 44-1.)

23

It is apparent that Violet's understandable wish is to protect its own economic interest in the property and the MSC contract.  Yet, that interest is not the stuff of federal officer removal jurisdiction.  Because Violet has not established that St. Bernard Port seeks to impose a civil or criminal penalty on Violet for acts performed in the past under color of office or to enjoin the performance of such acts in the future, federal officer removal is inappropriate.

**B.   28 U.S.C. § 1442(a)(2)**

Violet also asserts that removal is proper under 28 U.S.C. § 1442(a)(2).  This "rarely invoked" federal title dispute statute provides in relevant part:

> (a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> . . . .
>
>       (2) A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

28 U.S.C. § 1442(a); *Vanouwerker v. Owens-Corning Fiberglass Corp.*, 1999 WL 335960, *13 (E.D. Tex. 1999) ("[I]t appears that 28 U.S.C. § 1442(a)(2), the federal title dispute statute, is a

rarely invoked statute."). Reliance upon this statute requires satisfaction of two prongs. First, the title to the property in controversy must derive from an officer of the United States. *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F. Supp. 2d 26, 31 (D.P.R. 2002). Second, the controversy regarding the property must affect the validity of any law of the United States. *Id.*

Violet concedes that it did not derive the title to its property from an officer of the United States.[48] It argues, however, that, because it has a "property right" in its contract with MSC, and because it derived that property right from MSC, a federal officer, this Court has jurisdiction under section 1442(a)(2). Violet cites no authority in support of its argument, and the Court finds that it is foreclosed by the plain language of the statute, which states that a property holder's "title" must be derived from an officer of the United States. Use of the term "title" implies that the statute applies only to real property and not a contractual "property right." *See Black's Law Dictionary* 968 (9th ed. 2009) ("Though employed in various ways, title is generally used to describe either the manner in which a right to *real property* is acquired, or the right itself.") (emphasis added) (quoting Kent McNeil*, Common Law*

---

[48]    (R. Doc. 31-3 at 32.)

*Aboriginal Title* 10 (1989)); *see also, e.g.*, *Town of Davis v. West Virginia Power & Transmission Co.*, 647 F. Supp. 2d 622, 624 (N.D. W.Va. 2007) (analyzing the applicability of section 1442(a)(2) for removal of an action seeking to condemn a tract of land); *Bithorn*, 200 F. Supp. 2d at 28-29, 31 (analyzing section 1442(a)(2) in a dispute over real property). Because Violet did not derive its title to the real property in question from a federal officer, jurisdiction over this expropriation action is not proper under section 1442(a)(2).

**C.   28 U.S.C. § 1441(b)**

Finally, the Court rejects Violet's contention that removal jurisdiction over this action is proper under 28 U.S.C. § 1441(b). Section 1441(b) provides: "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship of the parties." District courts have jurisdiction over civil cases arising under the Constitution, laws and treaties of the United States pursuant to 28 U.S.C. § 1331. Unlike federal officer removal jurisdiction under section 1441(a), whether a claim "arises under" federal law must typically be determined by referring to the "well-pleaded

complaint." *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808 (1986) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9-10 (1983)).  This means that the federal question must appear on the face of the complaint.  *See Torres v. Southern Peru Copper Corp.*, 113 F.3d 540, 542 (5th Cir. 1997). Because defendants may remove a case to federal court based on a federal question only if the plaintiff could have brought the action in federal court from the outset, "the question for removal jurisdiction must also be determined by reference to the well-pleaded complaint." *Merrell Dow*, 478 U.S. at 808.

As St. Bernard Port does not assert any claims under federal law, federal question jurisdiction exists only if an exception to the well-pleaded complaint rule applies.  Relying on *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), Violet argues that removal was proper because this case "presents substantial federal issues regarding [St. Bernard Port's] interference with federal military and national defense interests."[49]  In *Grable*, the plaintiff filed a quiet title action in Michigan state court alleging that the defendant's title to certain property was invalid, and defendant removed.  *Id.* at 310.  A Michigan court rule required the

_____

[49]     (R. Doc. 31-3 at 27-30.)

27

plaintiff to specify the facts establishing the superiority of its claims, and plaintiff "premised its superior title claim on a failure by the IRS to give it adequate notice, as defined by federal law." *Id.* at 314.  Whether the plaintiff "was given notice within the meaning of the federal statute," the Court recognized, was "thus an essential element of its quiet title claim, and the meaning of the federal statute [was] actually in dispute . . . ." *Id.*  In finding federal question jurisdiction, the Court observed that the meaning of the federal tax provision was an important issue of federal law that belonged in federal court, especially in light of the Government's interest in the "prompt and certain collection of delinquent taxes," and the "IRS' need for certainty in notice requirements to provide buyers of seized property assurance that the IRS has taken all steps required to convey good title." *Id.* (quoting *United States v. Rodgers*, 461 U.S. 677, 709 (1983)).

The Supreme Court has since stated that only a "slim category" of cases will satisfy the *Grable* paradigm.  *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 701 (2006). The mere presence of a federal issue "does not automatically confer federal-question jurisdiction." *Merrell Dow*, 478 U.S. at 813; *see also Florida Marine Transporters, Inc. v. Trinity Marine Products, Inc.*, 2002 WL 31246765 (E.D. La. 2002) ("It is well-

established that the mere fact that a court necessarily must interpret federal law . . . to determine the merits of a claim is insufficient to confer federal jurisdiction."). Under *Grable*, federal question jurisdiction exists only when (1) resolving a federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities. *See Singh v. Duane Morris LLP*, 538 F.3d 334, 338 (5th Cir. 2008) (citing *Grable*, 545 U.S. at 314).

The Court finds that Violet has not met the requirements set forth in *Grable* to establish jurisdiction based on a substantial federal question. Violet relies heavily on the possibility that St. Bernard Port's expropriation is preempted by the Defense Production Act (DPA), 50 U.S.C. App. § 2061, and that assignment of the contract to St. Bernard Port would violate the Competition in Contracting Act, 41 U.S.C. § 253. Yet, unlike *Grable*, these federal issues are defenses to St. Bernard Port's expropriation, not essential elements to the cause of action. Put differently, whereas the basis for Grable's quiet title action was an alleged failure to receive the notice required by federal law, St. Bernard Port's expropriation action itself does not depend on the interpretation of a federal statute or regulation. Federal law

is only implicated by the defenses that Violet asserts.  Most
courts addressing this scenario have found that federal
jurisdiction is not appropriate.  *See Williston Basin Interstate
Pipeline Co. v. An Exclusive Gas Storage Leasehold*, 524 F.3d
1090, 1102 (9th Cir. 2008) (declining to exercise jurisdiction
because federal law was not an "essential element" of the
plaintiff's state law claim); *Herrera v. Guajardo*, 2001 WL 62432,
at *3 (N.D. Cal. 2011) (explaining that a state-law claim can
provide federal jurisdiction if it "rests on a federal question
in the claim itself (rather than as a defense)"); *District of
Columbia v. All of the Parcel of Land Identified in the District
of Columbia as 2626 Naylor Road*, --- F. Supp. 2d ---, 2011 WL
182045, at *2 (D.D.C. 2011) (discussing jurisdiction under *Grable*
and noting that "it is settled law that a case may *not* be removed
to federal court on the basis of a federal defense even if the
defense is anticipated in the plaintiff's complaint"); *City of
Patterson v. Shannon G., LLC*, 2008 WL 1995146, at *2-3 (D.N.J.
2008) (declining to exercise jurisdiction because federal
preemption under the Interstate Commerce Commission Termination
Act was raised as a defense, "not a necessary element of
Plaintiff's eminent domain claim").

 Violet, however, cites two cases in which courts have found
jurisdiction under *Grable* based on the "uniquely federal

interest" of national security, even though federal law was not
an essential element of the plaintiff's state-law claims: *Scrogin
v. Rolls-Royce Corporation*, 2010 WL 3547706 (D. Conn. 2010), and
*McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189 (M.D.
Fla. 2006).  Both cases involved state-law tort claims for
allegedly defective equipment provided by government contractors
to the military.  *See McMahon*, 410 F. Supp. 2d at 1201 (reasoning
that imposing civil liability implicated the interests of the
United States because, later, "either the contractor will decline
to manufacture the design specified by the Government, or it will
raise the price"); *see also Boyle v. United Technologies Corp.*,
487 U.S. 500, 506 (1988) (identifying a "uniquely federal
interest" in "*civil liabilities* arising out of the performance of
federal procurement contracts") (emphasis added).  In this case,
by contrast, Violet will not be exposed to civil liability, and
it will be compensated for any losses resulting from the
expropriation, including those related to its contract with MSC.
*See* La. Rev. Stat. § 19:9 (providing that, in an expropriation
action, the "owner shall be compensated to the full extent of his
loss").  The reasoning underlying *Scrogin* and *McMahon* is thus
inapplicable to St. Bernard Port's expropriation action.

Further, the Court finds it significant that MSC has not
intervened in this action.  As discussed above, when given the

31

opportunity to weigh in on the effect of the expropriation, MSC's response was equivocal, acknowledging that "there is some uncertainty regarding future contract performance," but stating that "it currently believes that the expropriation does not affect the Government's contractual rights and remedies."[50] Notably, MSC has at no point encouraged this Court to exercise jurisdiction.  *See* R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, *Hart and Wechsler's The Federal Courts and The Federal System* 139-40 (5th ed. Supp. 2008) (highlighting that, in *Grable*, the Solicitor General filed an amicus brief urging the Court to uphold jurisdiction).  With regard to state interests, which must also be considered when conducting a *Grable* analysis, Louisiana has an "inherent right . . . to acquire private property for public purposes without the consent of the owner, provided just compensation is paid," *Town of Vidalia v. Unopened Succession of Ruffin*, 663 So.2d 315, 319 (La. Ct. App. 1995), and federal courts are hesitant to intervene in areas that have traditionally been the domain of state law, *see Singh*, 538 F.3d at 339 (declining to exercise jurisdiction in a legal malpractice action, in part, because legal malpractice has traditionally been the domain of state law).  To the degree that Violet can assert

---

[50]   (R. Doc. 44-1.)

defenses under federal law to the expropriation, those defenses can be evaluated by the state court.  Finally, Violet is asserting a novel issue of Louisiana constitutional law on expropriation, which is best resolved by state courts in the first instance.[51]  Under these circumstances, the Court concludes that Violet has not met its burden to establish jurisdiction based on section 1441(b).

**D.   Attorneys' Fees and Costs**

In its motion to remand, St. Bernard Port asks the court for an award of just costs and actual expenses, including attorneys' fees, incurred as a result of Violet's improper removal under 28 U.S.C. § 1447(c).[52]  According to the Supreme Court, "[t]he appropriate test for awarding fees under § 1447(c) should recognize Congress' desire to deter removals intended to prolong litigation and impose costs on the opposing party, while not

---

[51]     Violet argues that expropriation of the subject property violates article I, section (4)(B)(6) of the Louisiana Constitution, which provides that "[n]o business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise."  La. Const. art I, § 4(B)(6).  As far as the Court is aware, no Louisiana court has yet interpreted the language of that section.

[52]     (R. Doc. 13-1 at 22.)

33

undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 133 (2005).  The standard thus turns on the reasonableness of removal, and fees should be awarded if the removing defendant lacked objectively reasonable grounds to believe the removal was legally proper.  *Hornbuckle v. State Farm Lloyds*, 385 F.3d 538, 541 (5th Cir. 2004).  Although the Court finds that removal is not proper in this case, Violet did not lack objectively reasonable grounds to believe removal was proper.  As such, an award of attorneys' fees and costs would be improper.

## III. CONCLUSION

For the foregoing reasons, St. Bernard Port's motion to remand is GRANTED.  St. Bernard Port's request for attorneys' fees and cost is DENIED.

New Orleans, Louisiana, this 25th day of August, 2011.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

34